## BATESVILLE AND BRINKLEY RAILROAD COMPANY, EX PARTE.

1. MINISTERIAL ACT: *What it is: Granting a restraining order.*
A ministerial act is one which an officer or tribunal performs in a given state of facts in a prescribed manner, in obedience to the mandate of legal authority, without regard to, or the exercise of, his own judgment upon the propriety of the act done. The granting of a restraining order is a judicial and not a ministerial act.

2. INJUNCTIONS: *Statute of 1881, regulating, nugatory, etc.*
The act of March 23, 1881, regulating the practice in suits for injunctions, is nugatory—confers no new jurisdiction—and so far as it authorizes a single Judge of the Supreme Court to review the Chancellor's decision, is unconstitutional. It is also in conflict with sections 4 and 15, article 7, of the Constitution. (English, C. J., dissenting from this last point.)

3. APPELLATE JURISDICTION: *What it is.*
Appellate jurisdiction, as used in our Constitution, means the review by a superior court of the final judgment, order, or decree of an inferior court.

## APPLICATION for mandamus.

For the statement of this case see the opinion of the Chief Justice, on page 89, which is referred to to avoid repetition.

*Clark & Williams* and *John McClure* argued orally for petition.

*J. M. Moore, contra,* argued orally.

*Dodge & Johnson, contra:*

1.   This court has no jurisdiction to grant the writ, cite and comment on *Allis, ex parte, 7 Eng., 100; Crise, ex parte, 16 Ark., 195; Good, ex parte, 19 ib., 411; Jones v. Little Rock, 25 ib., 287 ; Price & Barton v. Page, 25 Ark., 535 ; Fitch v. McDiarmid, 6 Ark., 485.*

2. Mandamus will not lie to control the judicial discretion of a competent court of equity, having original jurisdiction, etc., although the contrary was held in *Conway, ex parte, 4 Ark., 326; Pile, ex parte, 9 Ark., 336; Hutt, ex parte, 14 Ark., 369.* See *Gunn v. Pulaski Co., 3 Ark., 430; Ex parte, Jones, 2 Ark.; Johnson, ex parte, 25 Ark., 614; Black v. Auditor, 26 ib., 237; Hays, ex parte, ib., 511; McMillin v. Smith, ib., 614; County Court v. Robinson, 27 ib., 121; High on Ext. Legal Rem., secs. 149, 150-1-2-5-6-166,* and note 2, p. 136, and note 1, p. 129; *Ex parte, City Council, 24 Ala., 98,* and this is the settled law now both of England and America.

3. If it is contended that the proceedings under the act are in the nature of an appeal from an interlocutory order. Then the Legislature has no constitutional power to authorize this court to exercise its appellate authority by mandamus. The Legislature can not enlarge the powers of any body created by, or whose powers are defined by, the Constitution, by enlarging or changing in any way the meaning of the words used in the Constitution defining these powers.

As to the meaning of the Constitution when it says " the Supreme Court shall have power to issue writs of mandamus," etc., see *Cooley on Const. Lim., pp. 58 to 60.* It meant only " in cases warranted by the principles and usages of law." *Ex parte, City Council, 24 Ala., 98.*

4. *Sec. 1055 Gantt's Digest* provides that the appellate jurisdiction of this court shall only be over *final* orders, judgments, etc., and this court has held that an appeal will only lie from a *final* decree. *Hempstead, 209; 4 Ark., 235; 5 ib., 303; 26 ib., 95, 468, 662; 27 ib., 336.*

But if the act of March 23, 1881, page 185, is simply an enlargement of the right of appeal, so as to allow an appeal from an interlocutory order, mandamus is not the

proper remedy. The act is necessarily a procedure act, and in so far as it attempts to authorize the use of the writ of mandamus as a means of exercising appellate powers by this court, it is unconstitutional and void. *Ex parte, Newman, 14 Wall., 65.*

SMITH J. It was the practice of this court from 1842 to 1868, to entertain applications for a mandamus to compel Circuit Judges to grant injunctions. It was placed at first upon the original jurisdiction vested by the Constitution in the court to issue writs of mandamus, and upon the further ground that the issue or refusal of a preliminary injunction was not a judicial act, but the exercise of a ministerial discretion. *Conway, ex parte, 4 Ark., 336.*

And under the confusion of legal ideas involved in this theory of ministerial and judicial discretion, this court, in *Dixon v. Field, 10 Ark., 243,* went so far as to direct a mandamus to issue to a Circuit Judge to proceed with the trial of a cause, whereof he had already granted a continuance.

In *Kennedy, ex parte, 11 Ark., 598,* Chief Justice JOHNSON, delivering the opinion of the court, says that while the ordering of an injunction is a ministerial act, yet such act can only be done by a judicial officer. And a statute authorizing Masters in Chancery to order writs of injunction was held unconstitutional. This last case illustrates the potency of formulae and stereotyped phrases over the judicial mind. Mr. Justice SCOTT was too accurate a thinker not to perceive that what the court really decided was, that the act of granting or refusing injunctions was judicial, not ministerial, and, in a separate opinion, he insisted on placing the decision upon its logical ground.

Thus was knocked away one of the two props upon which the practice of the court, in the matter we are considering, rested for support. And when it was decided, as it afterwards was in *Allis, ex parte, 12 Ark., 101,* that this

Batesville and Brinkley Railroad Company, ex parte.

court had no original jurisdiction except in aid of its superintending control over the inferior courts of the State, the other prop also fell away, and there was no longer any good reason, nor indeed any reason at all, except the force of habit and the conservatism of the bench, why this anomalous practice should not fall into desuetude. It was the established doctrine, announced as early as *Gunn's Admr. v. Pulaski County, 3 Ark., 427,* that when an inferior tribunal has ·a discretion and exercises it, its action will not be controlled by mandamus. Or, as Chief Justice WATKINS puts it, in *Hutt, ex parte, 14 Ark., 368,* mandamus lies to put the court in motion where it refuses to adjudicate a cause of which it has cognizance, but not to control its discretion " by directing it what judgment to give, or to review the correctness of any decision made during the progress of a cause ; else the mandamus would become an indirect substitute for the final review by writ of ·error or appeal."

A ministerial act, is one which an officer or tribunal performs in a given state of facts, in a prescribed manner, in obedience to the mandate of legal authority, without regard to or the exercise of his own judgment upon the propriety of the act done. *Flournoy v. City of Jeffersonville, 17 Ind., 169.*

<div style="margin-left:auto">1. MINISTE-<br>RIAL ACT:<br>What it is.</div>

Tested by this definition, the granting of a restraining order, by which we mean the Chancellor's fiat, that a temporary injunction shall go, and not the mere issue of the writ by the clerk, is as much a judicial act, as the rendering of a decree upon its merits.

<div style="margin-left:auto">Granting<br>a restrain-<br>ing order.</div>

Nevertheless, the practice continued as before. The constitutionality of the act of December 15, 1838, had never been drawn in question, and later judges seem to have acquiesced, out of deference perhaps to the views of their predecessors, and influenced no doubt by a desire to prevent a

failure of justice, and a vague sense that the jurisdiction might be referred to the supervising power of this court. For there was only one person—the Circuit Judge—to whom suitors could apply for an injunction; and it might happen that no one was in commission, or that he was absent or disqualified. Applications were still heard for a mandamus, although such applications were rarely or never successful.

So much for the law and practice under the Constitution of 1836.

Now between that Constitution and the present one, so far as it respects the distribution of judicial power between this court and the Circuit Court, we can see no substantial difference. The phraseology is slightly altered, but there is nothing added or omitted which affects this case. It must also be conceded that the act of March 23, 1881, entitled " An act to regulate the practice in suits for injunctions, etc," is a reproduction of the act of December 15, 1838, which stood for thirty years unchallenged by the bar; the only difference being that the later act provides also for controlling the discretion of the Chancellor in refusing to appoint a receiver.

2. INJUNC-TIONS: Statute of 1881 regulating, unconstitutional, etc.    The jurisdiction of this court is derived from, and defined by, the Constitution. The Legislature can neither add to nor detract from it. The act is at least nugatory, for if the jurisdiction did not exist before its passage, it does not exist now. In fact, it purports to be nothing but a practice act. And in so far as it authorizes a single judge of this court to review the Chancellor's decision, the act is certainly unconstitutional; because the concurrence of two judges is in every case necessary to a decision; and it is the court and not individual members thereof that is empowered to hear and determine mandamus and other remedial writs.

Batesville and Brinkley Railroad Company, ex parte.

But we go further and say that the act is in conflict with section 4, article 7, of our Constitution, which provides that this court shall have appellate jurisdiction only, except in the two enumerated cases of writs of *quo warranto* to Circuit Judges and Chancellors, and the officers of political corporations when the legal existence of such corporations is questioned. We think it also conflicts with section 15 of the same article, which vests jurisdiction in effect exclusive in matters of equity in the Circuit Courts until separate Courts of Chancery are established. For it must be borne in mind that " an injunction is a writ issuing by the order and under the seal of a court of equity." (*1 Eden on Injunctions, 1.*) But it may be said that the jurisdiction here invoked is appellate. And Chief Justice WATKINS, in *Hutt, ex parte, supra,* does speak of it as " in the nature of an appeal allowed by statute from an interlocutory order of the inferior court." But this is a simile, and nothing is so apt to mislead as a simile. We understand that the framers of our Constitution, when they speak of "appellate jurisdiction," meant the review by a superior court of the final judgment, order or decree of some inferior court. This, if not its common law sense, was the statutory definition of an appeal and its signification in the acceptation of American courts at the time of the adoption of the Constitution.

Nor can it be properly said that the writ of mandamus in such cases is in aid of our appellate jurisdiction, for the object of the application is not to get the case before us on its merits, but to compel the Chancellor, while the case is still pending before him, to make an order, which, after mature deliberation, he has decided ought not to be made at this stage of the cause. And as for the supervisory jurisdiction, there is a wide field for the operation of that power in cases where the Circuit Court has no discretion,

3. APPEL-
LATE JU-
RISDIC-
TION:
What it is.

without extending it to cases where it is vested with a discretion and has exercised it. Thus, if it refuses to take jurisdiction of a case properly cognizable before it, or refuses to grant an appeal in a civil case, which is a constitutional right, mandamus is the appropriate remedy. If it assumes to hear and determine a matter of which it has not jurisdiction—e. g., a bastardy proceeding—prohibition lies. Many other illustrations might be put, some of which have already occurred in practice and are to be found scattered through our reports, of the useful exercise of this supervisory power in keeping the lower courts up to the line of their plain duty and at the same time within their constitutional orbits.

It was also urged in argument that cases of hardship and irreparable mischief were liable to occur, if we declined the jurisdiction, by reason of the possible ignorance, incapacity, obstinacy or corruption of some Circuit Judge. And to show the danger of a failure of justice in such cases, the erection of a nuisance near a residence property was instanced, and even the building of this very railroad, which it was sought to enjoin. It was suggested that the defendants would complete their railroad before the suit could be finally determined, and that the railroad, being there and already built, the plaintiffs would be remediless in the premises.

To all of which we answer that it is these hard cases which make shipwreck of the symmetry of the law; that, until the contrary is made to appear, we will presume the Circuit Judges know the law and are willing to do their duty; that in the case of the indictable nuisance, the injured party would not be forced to rely altogether upon the Circuit Judge, but might lay his complaint before the grand jury or apply to the County Judge for a restraining order; and the operation, as well as the construction of

railroads, may be enjoined. If the courts can stop the wheelbarrows, the pick-axes and the other implements used in making the road-bed of a railway, they can also arrest the revolutions of the car-wheels. The defendants will build this road at their own peril, if the plaintiff has a vested exclusive right of way from Newport to Batesville.

The result is, that we decline to consider the petition in this case.

ENGLISH, C. J.    On the thirty-first of July, 1881, the Batesville and Brinkley Railroad Company filed a bill in the Pulaski Chancery Court against the St. Louis, Iron Mountain and Southern Railway Company, alleging that the defendant company was proceeding to construct a branch railway from Newport to Batesville within the plaintiff company's right of way, and praying for an injunction.

On the bill, affidavits and pleadings in the case, the Chancellor, on the fourteenth of October, 1882, heard an application for an interlocutory injunction, and refused to grant it on the ground that there was no equity in the complaint.

The plaintiff company then made an application to this court, under the act of March 23, 1881, for a mandamus to compel the Chancellor to award the interlocutory injunction as prayed.

There being doubts about the constitutionality of the act of the twenty-third of March, 1881, on the suggestion of the court, the solicitors of the parties to the suit in chancery, have argued and submitted that question as preliminary to the merits of the application for mandamus.

The substance of the act of March 23, 1881, so far as it is involved in this application, is that in all cases where an application for an injunction, etc., shall be refused by a

Judge of the Circuit Court, or by any Circuit Court, or Chancellor, or by the Pulaski Chancery Court, such judge, Chancellor or court shall certify such refusal on the complaint, etc., and upon presentation of such complaint and certificate, etc., to the Supreme Court, etc., such Supreme Court shall, if satisfied that such injunction ought to be issued, etc., award a writ of mandamus commanding such judge, Chancellor or inferior court to grant the injunction, etc.    *Acts of 1881, p. 185.*

A similar act was passed December 15, 1838.    See *English's Digest, chap. 86, sec. 8; Gould's Digest, chap. 88, sec. 6.*

An application for a mandamus, under this act, was made to this court at its January term, 1842.    A bill for injunction had been presented to the Hon. JOHN J. CLENDENNIN, Judge of the Pulaski Circuit Court, and indorsed by him "refused, for want of jurisdiction."    Messrs. *Pike* and *Baldwin* presented the bill so indorsed to this court, under the above statute, and moved for a mandamus to compel the Circuit Judge to grant the injunction.    The application was resisted by Messrs. *Cummins* and *Ashley.* Neither the learned counsel engaged in the case nor the court seem to have questioned the constitutionality of the act.    The majority of the court decided that the lower judge had jurisdiction of the subject-matter of the bill, and that a proper case was made for an injunction, and a mandamus was awarded to compel its issuance.

In the opinion of the court, by JUSTICE LACY, it was said that the issuing or refusing an injunction was not a *judicial* act, but the exercise of a ministerial discretion, and the court seem to have been of the opinion that in awarding the writ of mandamus it was exercising original and not appellate or supervisory jurisdiction.    The court was then composed of Chief Justice RINGO, and Associate Justices LACY and DICKINSON.    *Conway et al., ex parte, 4 Ark., 303.*

The next reported case under the act is *Pile et al., ex parte, 9 Ark., 336,* decided at the January term of this court 1849, when Chief Justice Johnson and Associate Justices Walker and Scott were on the bench.

A bill had been presented to the Circuit Court of Oua-chita county for an injunction and refused.

Mr. Pike made the application to this court for a mandamus to compel the judge below to grant the injunction. The court decided that the facts stated in the bill made a case for an injunction, and ordered a mandamus. The opinion of the court was delivered by Justice Walker, who did not refer to the statute, or say anything about the constitutional power of the court, or whether the granting of an injunction was a ministerial or judicial act. A petition for reconsideration was filed by Messrs. Watkins and Curran, and overruled.

*Section 3, chapter 77 of the Revised Statutes,* authorized Masters in Chancery, who were ministerial officers, to grant injunctions in certain cases.

In *Kennedy, ex parte, 11 Ark., 599,* January term, 1851, the constitutionality of that statute came before this court.

Chief Justice Johnson, who delivered the opinion of the court, said (quoting Eden) that an injunction was a writ issuing by the order, and under the seal of a court of equity, and though, as held in *Conway, ex parte, 4 Ark., 302,* the ordering of it might be the exercise of mere ministerial discretion, yet it could be ordered only by a judicial officer, and that, as the courts were then organized under the Constitution of 1836, no judicial power could be vested in Masters in Chancery, hence the statute was unconstitutional.

Justice Scott agreed with the majority of the court that the statute was unconstitutional, but he placed it upon the ground that the granting or refusal of an injunction was

the exercise not of ministerial but of judicial discretion.

*Hutt, ex parte, 14 Ark., 368* (January term, 1854, when Chief Justice WATKINS and Associate Justices SCOTT and WALKER were on this bench), is the next reported case in which the act of December 15, 1838, was referred to.

The Pulaski Circuit Court had ordered a case continued, and an application was made to this court for a mandamus to compel the judge to try it. Chief Justice WATKINS, who delivered the opinion of the court, said: "The mandamus will go to compel the court to act, but not to control its judicial discretion, by directing it what judgment to give, or to review the correctness of any decision made during the progress of a cause; else the mandamus would become an indirect substitute for the final review by writ of error or appeal."

That learned judge knew, as well as Justice SCOTT did, that the granting or refusing an injunction was the exercise of judicial discretion, and he also knew very well that it had been the practice of the court, under the above act, to review the orders of the Circuit Judges refusing injunctions, and to award mandamuses to compel them to grant them in cases where the bills showed that complainants were entitled to them, so he added, in the above opinion: "The proceeding by mandamus to compel a Circuit Judge, sitting as a Chancellor, to grant an injunction, as prayed, upon any given case presented to him by the bill, and which he has refused, is in the nature of an appeal, allowed by statute, from some interlocutory order or decree of the inferior court."

This is the last reported case in which the statute was noticed while the Constitution of 1836 was in force. There is, however, an unreported case within my memory. In the year 1860, when the present Chief Justice and Asso-

ciate Justices COMPTON and FAIRCHILD were on this bench, and Hon. U. M. ROSE was Chancellor of Pulaski Chancery Court, an injunction was refused by him, and an application made to this court for mandamus to compel him to grant it. The court, after looking into the case, suggested to the solicitor of the applicant that if he would make a certain amendment to the bill he would be entitled to an injunction. The amendment was accordingly made, the bill again presented to the Chancellor, and an injunction granted.

The judicial article of the Murphy Constitution of 1864 was like that of the Constitution of 1836.

In *Hodges, ex parte, 24 Ark., 197* (December term, 1866, when Chief Justice WALKER and Associate Justices COMPTON and CLENDENNIN were on this bench), Messrs. Pike & Adams presented an application for mandamus to compel a Circuit Judge, who had refused it, to grant an injunction. The court, in an opinion delivered by the Chief Justice, reviewed the facts alleged in the bill, decided that a case was made for an injunction, and ordered a mandamus to compel the Circuit Judge to grant it.

After the reconstruction Constitution of 1868 had been declared in force, and at the December term, 1868, of this court, an application was made for a mandamus to compel the Chancellor of the Pulaski Chancery Court to reinstate an injunction. The court looked into the allegations of the bill, and held that a case was not made for an injunction, and refused a mandamus. *Jones v. Mayor, etc., 25 Ark., 301.*

At the December term, 1869, an application was made for mandamus to compel a Circuit Court to reverse its action in overruling a motion to dismiss a bill of complaint, and this court held that the judicial discretion of the Circuit Court could not be controlled by mandamus, and refused the writ. *Johnson, ex parte, 25 Ark., 614.*

Batesville and Brinkley Railroad Company, ex parte.

In *Hays et al., ex parte, 26 Ark., 510* (January term, 1871), an application was made to this court for a mandamus to compel a Circuit Judge, who had refused an injunction at chambers, to grant it. Chief Justice McClure, who delivered the opinion of the court, said: "Will this court award a mandamus under such circumstances? We emphatically say, No! Before the adoption of the Code, under the provisions of section 6, chapter 88, of Gould's Digest, a mandamus was authorized to be issued against a Circuit Judge or a Circuit Court that refused to grant an injunction, by any judge of this court, or by the court itself; but chapter 88 of Gould's Digest is no longer in force, it being superseded by chapter 4 of the Civil Code. *Mandamus* never lies to control judicial discretion—it only lies to compel the performance of a public duty, and only then when there is no other legal remedy, etc. Under chapter 88 of Gould's Digest the Circuit Court, in term-time, or any judge thereof, in vacation, was the only power in the State that could grant an injunction, but it is not so now. A Probate Judge, a Circuit Judge, or a Judge of the Supreme Court, is authorized to grant an injunction, etc. In the case now before us, it appears that the Circuit Judge is of opinion that the complainant is not entitled to the relief demanded, upon the showing made. This refusal does not leave the complainant remediless under the Code, as it did under chapter 88 of Gould's Digest, because, after the Probate Judge of the county and the judge of the circuit have refused, there are five Supreme Judges, any one of whom has the power to grant an injunction until the cause is heard on its merits," etc.

With the Constitution of 1868 passed away so much of the Code as authorized the judges of this court to grant injunctions.

Under the present Constitution neither this court nor one of its judges has power to grant an injunction, except it be

an ancillary injunction, in aid of its appellate jurisdiction, etc.

So, from the adoption of the Constitution of 1874 until the passage of the act of March 23, 1881, where a Circuit Judge or a Chancellor refused to grant an injunction, the complainant had no remedy except to abide the action of the judge, Chancellor, or court, until final decree, and then appeal to this court.

After the passage of that act, and, before this case, two applications were made to this court, under the act, for mandamuses, to compel Circuit Judges to grant injunctions.

Justice EAKIN, deeming the act unconstitutional, declined to look into the cases. Justice HARRISON and myself heard the applications and refused the writs, because clear cases for injunctions were not made by the bills, reserving for future consideration the question of the constitutionality of the act. We hesitated to pronounce the act unconstitutional, because it was like the old act of 1838, the constitutionality of which seems never to have been questioned by bar or bench during its long life.

In *State of Missouri, ex rel, etc., v. Wilson, Judge, etc., 49 Mo. R., 146,* there was an application to the Supreme Court of Missouri for a mandamus to compel a Circuit Judge to grant a preliminary injunction, which he had refused. The case was decided in 1871, when the Constitution then in force vested in the Supreme Court of that State appellate and supervisory jurisdiction like that vested in this court by the Constitution of 1836. The court decided that the refusing or granting of an injunction was the exercise of judicial discretion, which it had no power to control by *mandamus*, and that judicial discretion means sound discretion guided by law. Justice BLISS, who delivered the opinion of the court, said : " We have been referred to but two cases where a *mandamus* has been issued to compel the allowance of an injunction, nor have we been able to find

others.   These both arose in the State of Arkansas, and are *Conway et al., ex parte, 4 Ark., 325, and Pile et al., ex parte, 9 Ark., 336.*   In that State authority is given the Supreme Court by statute to award a mandamus in a proper case to the Circuit Courts or judges, compelling them to grant an injunction.   (*Gould's Digest, 602.*)   The cases cited do not refer to the statute, and one of them undertakes to derive the power from the assumption that the act of the judge is a ministerial one.   While in both cases the jurisdiction of the court under the statute is undoubted, I am not struck with the force of the reasoning in the case of Conway, where it is sought to be based on other grounds. The case cited in its support does not sustain it.

"It is said that if a mandamus is denied, parties may be without remedy in case a Circuit Judge should refuse to allow a preliminary injunction.   There is certainly force in this suggestion, and it has been considered.   Cases of hardship might arise, although practically injunctions are issued rather too profusely than too sparingly.   The remedy is an extraordinary one, and the law places it in the first instance only in the hands of certain officers and courts.   The Supreme Court has no original jurisdiction in the matter, and we can not take it indirectly by passing upon the equity of a petition before the suit is instituted. If it is considered that the ends of justice require that we do so, a statute similar to the one in Arkansas should be enacted.   Until then we must be content with an appellate jurisdiction."

The jurisdiction of this court is plainly defined by the present Constitution.   It has original jurisdiction to issue writs of *quo warranto* to the Circuit Judges, and Chancellors when created, and to officers of political corporations when the question involved is the legal existence of such corporation.   *Art. 7, sec. 5.*

It has appellate jurisdiction co-extensive with the State,

under such restrictions as may from time to time be pre-scribed by law.

It has a general superintending control over all inferior courts of law and equity.

And, in aid of its appellate and supervisory jurisdiction, it has power to issue writs of error, and supersedeas, certi-orari, habeas corpus, prohibition, mandamus, and quo warranto, and other remedial writs, and to hear and deter-mine the same. *Art. 7, sec. 4.*

The granting or refusing an injunction being a matter of judicial discretion, the statute aside, this court could not, under its superintending control jurisdiction, compel the Chancellor, by *mandamus*, to grant it.

If the statute in question has any constitutional validity, it must be on the ground that it provides for a mode of review, in the nature of an appeal, as indicated in *Hutt, ex parte, supra.*

My brother judges have come to the conclusion that the act is unconstitutional, in which conclusion I am unable to concur, except as to so much of the act as authorizes one judge of this court to review and reverse the decision of an inferior court or judge, refusing an injunction, and to compel the granting of it by mandamus.